```
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

-----------------------x
SELWYN DARBEAU,        :
                       :
        Plaintiff,     :
                       :
                       :
        v.             : No. 06-01081(AK)
                       :
PROGRESSIVE TECHNOLOGY :
FEDERAL SYSTEMS, INC., :
                       :
        Defendant.     :
-----------------------x
```

                                    Washington, D.C.

                            Thursday, September 20, 2007

Deposition of

                    SHEILA HESS

a witness, called for examination by counsel for

Plaintiff pursuant to notice and agreement of

counsel, beginning at approximately 2:17 p.m. at

the law offices of Jordan Coyne & Savits, LLC, 400

Connecticut Avenue, NW, Washington, D.C., before

Sharon Shapiro of Beta Court Reporting, notary

public in and for the District of Columbia, when

were present on behalf of the respective parties:

18

```
 1        A    I understand, yes.  We're only
 2   referring to this one.
 3        Q    When it came time to transition
 4   from the previous contract to the current
 5   ongoing contract, is it fair to say that PTFS
 6   had to make a decision with respect to which
 7   employees to retain and which employees not
 8   to retain?
 9             MS. WHELIHAN:  Objection.
10             THE WITNESS:  No, it is -- well --
11             MS. WHELIHAN:  Yes, now you can
12   answer.
13             THE WITNESS:  No, it is
14   not -- that's not correct.
15             BY MR. PRESSLEY:
16        Q    What happened in reference to that
17   decision?  How was that handled in terms of
18   which employees to keep and which employees
19   to not keep under the ongoing current
20   contract?
21        A    The library gave us Mr. Darbeau and
22   other employees -- and I don't remember who
```

19

1   at the time -- we just absorbed them all.  We
2   had no decision.  It was not a decision for
3   us.  We absorbed the employees.
4        Q   So if you know -- that was part of
5   the contractual arrangement?  In other words,
6   the Library of Congress would be able to
7   determine which employees would remain?
8        A   I don't know how the Library made
9   those decisions.  All I know is that we had a
10  contract with them.  They had a contract with
11  people on it that was ending.  We had a
12  contract in place.  They asked us to put
13  those people on our contract.  And we did it.
14       Q   Was there a particular individual
15  at the Library of Congress -- once again, if
16  you know -- who was the primary person
17  involved in that decision?
18       A   Well, at the time, the COTR -- do
19  you know what a COTR is?  The person from the
20  Library who was responsible for our contract.
21           Yes.  His name was Christopher
22  Hansen.

```
 1            MS. WHELIHAN:  And Ursula came on
 2    board in October of 2005.
 3            THE WITNESS:  Right.  Okay, well --
 4            MS. WHELIHAN:  But it's okay.
 5            THE WITNESS:  I don't recall the
 6    exact dates.
 7            MR. PRESSLEY:  No, I understand.
 8            BY MR. PRESSLEY:
 9        Q   Prior to your receipt of that
10    e-mail, had you had any basis for assessing
11    the job performance of Mr. Darbeau?
12        A   No.
13        Q   With respect to PTFS, would you
14    have been considered his immediate
15    supervisor?
16        A   For PTFS, yes, but when our people
17    work on-site and all of my staff work on
18    another site, the people they're responsible
19    to who give them their tasks, are the COTR,
20    or a designated -- a person designated by the
21    COTR to give them tasks.
22            MS. WHELIHAN:  Or the COTR's
```

1       Q    So is it fair to say that the COTR
2  was the manager of these individuals on a
3  daily basis for all intents and purposes?
4            MS. WHELIHAN:  Objection to the
5  form of the question.
6            You can answer.
7            THE WITNESS:  Oh, okay.  I'm not
8  sure I'd use the word "manager."  I'd say
9  assign the tasks and -- you know, "manager"
10 is too broad a term.  I really don't want to
11 get into that, but they did assign the tasks
12 to -- you know, let them know what their
13 responsibilities were, what they had to do.
14           BY MR. PRESSLEY:
15      Q    Correct me if I'm wrong, but it
16 seemed like you were about to say
17 "supervisor" at some point.
18      A    Well --
19      Q    Would you say that the COTR
20 supervised the individuals on the contract --
21      A    Mm-mm.
22      Q    On a daily basis?  You wouldn't say

29

```
 1    tell me and -- first and see if we can work
 2    with the employees.  You know, it depends.
 3    There's no hard and fast rule.
 4         Q    Prior to your receiving the e-mail
 5    that was previously referenced from
 6    Ms. Holmes regarding Mr. Darbeau --
 7         A    Mm-hmm.
 8         Q    Had she given you any indication
 9    that there were any problems with the
10    performance of Mr. Darbeau?
11              MS. WHELIHAN:  And by "she," you
12    mean Ursula Holmes?
13              MR. PRESSLEY:  Yes.
14              MS. WHELIHAN:  Okay.
15              THE WITNESS:  No.
16              BY MR. PRESSLEY:
17         Q    Had anyone else at the Library of
18    Congress given you any indication that there
19    were problems with the performance of
20    Mr. Darbeau prior to this e-mail?
21         A    No.
22         Q    Were there any personnel files or
```

1   records turned over to PTFS in conjunction
2   with the employees that you maintained on the
3   contract?
4       A   Do you mean that came from the
5   other contractor?
6       Q   Either from the other contractor or
7   from Library of Congress.
8       A   No.
9       Q   Prior to your receipt of that
10  e-mail, did you have any basis to believe
11  that Selwyn Darbeau was not able to fill the
12  position of contract specialist?
13      A   No.
14      Q   After you received an e-mail from
15  Ms. Holmes, what did you do?
16      A   I called Mr. Darbeau and told him
17  not to go back.
18      Q   Did you speak with Ms. Holmes
19  first?
20      A   No, I don't recall.
21      Q   Do you recall speaking to her about
22  the e-mail at all?

31

```
 1        A    No, I don't recall.
 2        Q    What would have been your normal
 3   practice when you received an e-mail
 4   basically requesting that an employee be
 5   terminated for some reason?
 6             MS. WHELIHAN:  Objection.
 7             You can answer.
 8             (Interruption)
 9             THE WITNESS:  Oh, I'm sorry.  I'll
10   turn that off.
11             To terminate the employee.  I'll
12   just turn this off.
13             (Discussion off the record)
14             BY MR. PRESSLEY:
15        Q    Is it fair to say that you had
16   received communications from COTRs prior to
17   this particular e-mail requesting that
18   employees be terminated from the contract?
19        A    From COTRs from other contracts?
20        Q    Yes.
21        A    Yes.
22        Q    Did you ever discuss the
```

35

```
 1        Q    Did you ask Mr. Darbeau about the
 2   allegations in the e-mail?
 3        A    No.  I don't think so.  Now, I
 4   don't remember; I might have.  I don't -- I
 5   shouldn't say no.  I don't think so, but I
 6   couldn't tell you for sure.
 7        Q    Did Ursula Holmes ever provide any
 8   documentation relating to the alleged
 9   performance problems of Mr. Darbeau?
10        A    In the e-mail that she sent me
11   saying that he should not return, she
12   listed -- the reasons why not.
13        Q    Did she ever provide any other
14   documentation other than that e-mail?
15        A    I don't think so.
16        Q    In other words, did you ever see
17   any negative letters that customers of the
18   Library had written about Mr. Darbeau?
19        A    No, I didn't see any.
20        Q    Or did you see any documents that
21   had mistakes on it that were drafted by
22   Mr. Darbeau?
```

```
 1        A    I didn't see any.
 2        Q    Was there ever any investigation
 3   conducted by PTFS regarding the allegations
 4   in the e-mail?
 5        A    No.
 6        Q    Are you familiar with the
 7   electronic acquisition system -- I believe
 8   it's called Momentum -- that was used at the
 9   Library of Congress?
10        A    Well, I know there's a system with
11   that name, but I have no experience with it.
12             When you say, "are you familiar,"
13   yes, I know about it.  Did I know anything
14   more than the name and that they were using
15   it?  No.
16        Q    Had you ever heard anybody talk
17   about any problems with that particular
18   system?
19        A    Well, yes, I heard problems, but I
20   hear problems about every system.
21        Q    What problems had you heard about
22   with respect to Momentum?
```

38

1            MS. WHELIHAN:  No, no.
2            THE WITNESS:  I am -- today, I am
3    still employed by PTFS.
4            MR. PRESSLEY:  Oh, okay.  I don't
5    know where that came from.
6            BY MR. PRESSLEY:
7        Q   Ms. Holmes is still the COTR?
8        A   Yes.
9        Q   Since Ms. Holmes has been the COTR,
10   has she initiated the termination of other
11   individuals?
12       A   Yes.
13       Q   Who are those other individuals?
14       A   There have been a couple.  Young
15   women; I can't think of their names at the
16   moment.  One was Chelsea Baker.  One -- the
17   other is just -- you probably have that.
18           MS. WHELIHAN:  I probably do.  But
19   now I have to punch you and not tell you.
20           THE WITNESS:  Okay.
21           BY MR. PRESSLEY:
22       Q   Any other individuals other than

1    Mr. Darbeau who are over 40 whose termination
2    Ms. Ursula Holmes initiated?
3         A    I'm going to tell you, no, I don't
4    think so, but I don't know the ages -- age, I
5    never ask people their age.  I don't know
6    what ages they are, but I don't think that
7    they were over 40.  But I might -- I might be
8    incorrect.  But a couple of them looked
9    pretty young to me.
10        Q    How many individuals are we talking
11   about?
12             MS. WHELIHAN:  Latrina Wright.
13             THE WITNESS:  Latrina Wright.
14             MS. WHELIHAN:  And Chelsea Baker.
15             THE WITNESS:  And Chelsea Baker.
16   They were in their 20s.
17             MS. WHELIHAN:  Answer to
18   Interrogatory 13, John.
19             MR. PRESSLEY:  Right.
20             THE WITNESS:  Okay.
21             MR. PRESSLEY:  I didn't know
22   whether they were --