# LIBRARY OF CONGRESS CONTRACTS AND GRANTS MANAGEMENT OFFICE

## POTENTIAL WITNESSES

**Sheila Hess** – Director, Professional Services Division
Progressive Technology Federal Systems (PTFS)

> Instructed me by telephone (12/29/05) not to report to duty at LOC as scheduled on Jan 5, 2006, following approved vacation leave. Provided the only notice of dismissal in the form of a copy of the email from Ursula Holmes. In a meeting at PTFS on January 9th 2006 she expressed her exception to the events, as well as other concerns.

**Christopher Hansen** – Contract Specialist/COTR

> The Contracting Officer Technical Representative who managed the contracts between the Library of Congress and JHT, Inc and PTFS, respectively. Chris can address the allegations by Ursula Holmes in the email to Sheila Hess of PTFS.

**Rene Servin** – Hispanic Male

> Worked as a contractor on the PTFS Contract with the Library. Later terminated under similar circumstances (by Holmes &/or Johnson), then hired by PTFS at their Corporate Offices. Later terminated after providing deposition in the case.

**Carol Barton** – White Female

> Hired as a highly qualified LOC employee. Terminated within her probationary period under questionable conditions. Ms. Barton encountered numerous problems working with Ms. Holmes and Mr. Johnson which led to her short tenure at the Library. She made several complaints to the Library hierarchy..

**Joan Fitts** – Supervisor, FEDLINK

> In her capacity as Supervisor participated on two interview panels for positions applied for in the contracts office. Her comments following the interviews were always favorable. She was bewildered and dismayed that I was not selected, and expressed to a co-worker.

**Napoleon Jasper** – Former Supervisory Contract Specialist

> As the former supervisory contract specialist, he participated/conducted the interview in which I was hired in December 2003, along with the Acting Chief of Contracts, William Barker.


Attachment C

William Baker – Acting Chief of Contracts

>Was Chief of Contracts at the Navy Yard. Mr. Barker was aware of the abrupt termination of the contract at the Navy Yard and invited me to join him at the LOC. My job performance at the Navy Yard was highly rated and earned me a letter of commendation by the Department of the Navy.

Walker Joann – Contract Specialist

>Throughout my tenure at the Library, Mrs. Walker was extremely helpful in assisting with my indoctrination of the LOC's way of doing things. Could be a good, if not hostile witness, as she is very closely aligned with management and is likely to toe-the-line.

Verna Tubman – Administrative Support

>One of four (non-library) employees working under contract with JHT and PTFS. Following reorganization by the new Chief of Contracts (Ms. Coleman) in October 2004, Ms. Tubman was assigned contract specialist work. Her qualifications, work ethic and attendance are questionable. In fact, it raises the question as to , what criteria was used to arrive at the decision to terminate my services.

Nydia Coleman – Chief of Contracts

>As the new chief, in a one-on-one meeting upon her arrival reviewed my work experience and requested that I assume additional responsibilities, to include assignment the processing of small purchase acquisitions. Ms. Coleman headed the panel of interviewers on the two occasions I submitted applications for positions within the contract office. Following the first interview, Ms. Coleman informed me of the decision to hire someone from the outside (as her preference) but suggested that there will be more announcements in the future and encouraged me to apply, which I did.

George Daves – Chief, Grants Management

>Participated as a panelist on two job interviews with Ms. Coleman.

**CUSTOMERS** – LOC employees in the various departments with who contract specialist work with to process requisitions and assist with other related services.

Barbara Exum – CRS      Donald Simon – LAW
Mark Wilson – ITS       Maria Anderson – CRS
Charlene Mobley – OSI

After managing the Operations Section of the Contracts Team for three months now, I've found that the services provided by Selwyn Darbeau are less than acceptable.

a. He is unable to effectively manage his workload;
b. I consistently receive phone calls and emails from our customers regarding his failure to follow up or simply respond to their requests for updates;
c. I am rarely able to sign the documents Selwyn prepares for my signature when initially submitted due to his inability to catch typographical errors as well as process errors;
d. Selwyn has not grasped the use of the Library's electronic acquisition system (Momentum) as his data entries often require the assistance of our IT staff to fix errors;
e. On several occasions, Selwyn has promised to "get back to me" with the status of an assignment and he has failed to do so. In addition, he has given me updates on assignments that were false which caused me to provide inaccurate information to our customers.

Currently, Selwyn is on vacation and is scheduled to return to the office after the new years holiday. As his employer, you need to contact Selwyn, while he is on vacation, to let him know that his services at LOC are no longer needed. I need you to obtain his LOC Badge and keys and bring those items to my office as soon as possible. We will box up Selwyn's personal items and have the box ready for you when you come to turn in his badge and office keys.

Attachment D

| | EMAIL ALLEGATIONS PROVIDED TO PTFS BY HOLMES | STATEMENTS "MY OBSERVATIONS" BY HOLMES 11/2/05- CONTRACTS TEAM MEETING. |
|---|---|---|
| A | He is unable to effectively manage his workload; | No tracking system to effectively keep track of everyone's workload and tl status of each assignment<br><br>*In The first place, I was hired because there was a persistent work overloc OCGM. What are the specifics on which she bases this generalization?* |
| B | I consistently receive phone calls and emails from our customers regarding his failure to follow up or simply respond to their request for updates; | *This observation is simply false and not consistent with my professionali and long standing work ethic. What are the specifics? (Who, when, what* |
| C | I am rarely able to sign the documents Selwyn prepares for my signature when initially submitted due to his inability to catch typographical errors as well as process errors; | I don't see any consistency in how we do what we do. Everyone seems to or her own thing. *[This observation was made during the time I was experiencing impaired vision, a temporary condition which was later cor with surgery].*<br><br>**THERE IS AND HAVE BEEN NO WRITTEN PROCEDURE, NO CLE UNCHANGING SET OF GUIDELINES, AND NO ATTEMPT ON HOLMES' PART TO CREATE ONE**<br><br>*Further, by way of explanation (not excuse), I am a diabetic, anc the time I was employed by OCGM, had been scheduled for cataract surg which affected my ability to proofread. But the primary reason for any ei was the unreasonable amount of work I was expected to complete: the bt one gets, the likelier he or she is to make mistakes.* |
| D | Selwyn has not grasped the use of the Library's electronic acquisition system (Momentum) as his data entries often require the assistance of our IT staff to fix errors; | Momentum is not geared to the 1102's responsibility. We must not rely tot on Momentum to ensure we're in compliance with FAR and LOC requiren<br><br>*Momentum is a newly-instituted electronic procurement tool that was des for military/aerospace acquisitions, and is neither user-friendly nor well-s to its LOC application. Additionally, you were given neither coherent train nor a training manual to teach you how to use it, and like all other personi forced to work with it, your learning process was pure trial and error. The system is so flawed that even long-term users require IT support to deciph arcane error messages and operational quirks—so that almost everyone in department "often require[s] the assistance of [the] IT staff to fix errors."* |
| E | On several occasions, Selwyn has promised to "get back to me" with the status of an assignment and he has failed to do so. In addition, he has given me updates on assignments that were false which caused me to provide inaccurate information to our customers." | There is no way to share team wide information (who's working on what, has a solicitation open, when does it close, etc.) |

# DECLARATION OF CHRISTOPHER W. HANSEN

1. My name is Christopher W. Hansen. I am a Contract Specialist GS-12, Office of Contracts and Grants Management, Office of the Deputy Librarian, Library of Congress. I have been in this position for 22 years in July 2006. My current supervisor is Ursula Holmes, Supervisory Contract Specialist. She has been my supervisor since October 2005. Ms. Holmes supervisor is Nydia Coleman. My contact number during the workday is 202-707-8613.

2. My date of birth is March 21, 1954 and my race is Caucasian.

3. I am the longest serving contract specialist in the Library. I will have 23 years of service this July. I have served under every chief of contracts the Library has ever had.

4. I first met Selwyn Darbeau when I returned from working in the Law Library of the Library of Congress. At that time he was working for Napoleon Jasper, who was the acting head of contracts, and William Barker, who was the acting chief of contracts. Selwyn was working on setting up a file system for our contracts which had become disorganized and confused due to years of neglect and loss of staff. In spite of the importance of creating a usable file system so that we could find our contracts and administer them, Nydia Coleman, the current chief of contracts told Selwyn his work on the files was not a priority and he was to work on purchase orders.

5. Sometime around March 2005 Ms. Coleman informed me that funding for the contract workers, of which Selwyn was one, was running out and I was told to find out how they were working at the Library and what could be done to keep them on the job because they were vital to keeping the office functioning. In my investigation I learned that there were two contracts for the contract workers and one was expiring and the other had funds that had not been used at all. I coordinated with the appropriate parties to keep the contract workers working until the funding would be exhausted and then arranged for the contract workers to be moved to a task order from the Mega Contract with $100,000 followed by an additional $100,000.

6. Almost immediately after I resolved the funding questions for the contract workers Ms. Coleman informed one of them, Lula Thornton, 301-856-6992, that she "was too expensive" and Ms. Coleman didn't think the Library could afford her. Lula was a retired former federal contracting officer and was the highest paid in view of her greater years of experience. This began a series of events where the established, older, experienced contract workers were pushed out and younger (under 25 years old), less experienced (none had worked in federal contracting operations previously), and cheaper contract workers were brought on board, while those over age 40 were fired or constructively discharged.


Attachment E

7. The automated procurement system we began to use is called Momentum. The contracts office was not involved in the procurement or evaluation of this software and it was purchased from American Management Systems (later bought by a Canadian firm and became CGI-AMS) which had sold the Library the previous automated software system, PDT, which never worked effectively for the 12 years it was in use. Once glaring defect was the contracts package could not generate a contract forcing the Library to use alternative methods to create contract documents. This problem was not only repeated with Momentum, it was amplified by numerous other defects, problems, and the astonishing lack of any user manual, both printed and on line. While there had been training classes provided by AMS-CGI, they were confusing and poorly presented. The on site personnel were not very helpful, dwindled in numbers, and quickly disappeared without much interest on the contractor or Library management's part for improving the poor performance of the system.

8. The poor design of Momentum was such that it was impossible to use it to manage your work on any level. Ms. Ursula Holmes, who had become the new head of the contracts section October 2005, intended to use a software package she called Tracker to help manage the workload. It did not become available until October 2006. Likewise, while a contract specialist handbook was created, the "final" version was presented by Ms. Holmes in February 2006 with blank pages, no page numbers in the table of contents, and numerous other gaps with only ad hoc handouts, or emails, providing limited, and contradictory guidance. Ironically, one of the memoranda Ms. Holmes consistently uses is one Selwyn prepared November 2005 for exercising the option to extend the term of a contract.

9. While Ms. Holmes may have complained that Selwyn did not follow up or simply respond our customer's requests for updates I had to wait for Ms. Holmes to provide a replacement chair for me to use after notifying her six months earlier that it was broken and needed to be replaced. She only took action when the chair completely broke and was no longer usable. On January 22, 2007 a customer complained that the latest team leader hired, Larry Register, had a full voice mail box at 1:00 PM, wasn't in his office when the person stopped by to see why there was no response, and was still not available and his voice mail was still full an hour later.

10. Ms. Holmes has frequently shuffled requisitions among workers so frequently it has become a game of musical chairs. Sometimes three people have worked on the same requisition in a succession of frantic attempts to get the work out.

11. When I spoke with many people who worked with Selwyn and told them he had been fired they were shocked and dismayed because they never had any complaints or problems with him. Furthermore, I have heard several people

2

complain about the lack of direction and effectiveness of the contracts office, the lack of responsiveness of managers and workers, and the improper use of the contract workers in a personal services capacity which is in violation of the FAR, LCRs, and personnel regulations.



**DEPARTMENT OF THE NAVY**
FLEET INDUSTRIAL SUPPLY CENTER
NORFOLK DETACHMENT WASHINGTON DC
1014 N STREET SE SUITE 400
WASHINGTON NAVY YARD DC  20374-5014

```
                                              5000
                                              LG/rlwb
                                              02 Apr 03
```

From:  Officer In Charge, Fleet and Industrial Supply Center, Norfolk, Washington Detachment

To:    Mr. Selwyn Darbeau

Via:   Ms. Cynthia Y. Harrison, President
       Automation Management Service Company, Inc.
       912 Thayer Avenue, Suite 310
       Silver Spring, MD 20910

Subj:  LETTER OF APPRECIATION

It gives me pleasure to commend Mr. Selwyn Darbeau for exemplary performance during April-December, 2002 as a member of the Closeout Team. Working under intense pressure to analyze various database systems, including the "Driver-3" Closeout database, MOCAS database, and SPS database, he provided an integral part in separating and identifying the number of contracts eligible for closeout at FISC DET WASH. It was necessary to establish a baseline of eligible contracts in order to measure progress of the important task of DOD transitioning from an old payment and contract management system to a new updated system.

While performing an inventory and restructuring of the main filing system, the team was able to continue the closeout process for a record number of contracts closed. To achieve these outstanding results required a high level of professionalism and team spirit.

Congratulations to Selwyn for a job well done.

HARRY F. MCDAVID
CAPT, SC, USNR



Attachment F